**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| Ricardo Martínez-Porte, | CASE NO. 1:22cv768 |
| Plaintiff, | JUDGE |
| vs. | |
| Multi-Color Corporation, | |
| Defendant. | |

<u>**COMPLAINT WITH JURY DEMAND**</u>

Ricardo Martínez-Porte ("**Plaintiff**"), by and through his undersigned counsel, brings this Complaint with Jury Demand against Multi-Color Corporation ("**Defendant**" or "**Multi-Color**"), and states as follows:

**NATURE OF THE ACTION**

1.      Plaintiff seeks monetary relief of not less than USD $15 million to redress the harms caused by Multi-Color in December 2020 when Multi-Color wrongfully took possession of all of the value corresponding to Plaintiff's 40 percent share in a very successful printing label company, WS Packaging Mexico, S.A. de C.V. ("**WSMEX**").

2.      Although Multi-Color's website espouses "Integrity" as one of its values, its actions against Plaintiff in 2020 and since demonstrate a brazen disregard of the law and corporate ethics.

3.      WSMEX is Plaintiff's life's work. He created WSMEX nearly 35 years ago out of nothing and almost single-handedly grew it into one of the most successful printing companies in Mexico. For decades, Plaintiff took a modest salary and reinvested all company profits back into WSMEX. By 2020, WSMEX had a growing list of multinational clients, millions of dollars in its bank accounts, dozens of employees who had become part of Plaintiff's extended family, and lofty

financials demonstrating economic growth of nearly 300% in recent years. But in December 2020, Multi-Color took away Plaintiff's opportunity to cash in on his life's work.

4.      Multi-Color, which is headquartered in this District, is one of the biggest printing label companies in the world with billions of dollars in annual revenue and more than one hundred subsidiaries located in over 25 countries. In July 2019, following a corporate merger, Multi-Color became Plaintiff's corporate partner and the 60 percent shareholder of WSMEX.

5.      But Multi-Color never intended to operate WSMEX as a partnership with Plaintiff. From the beginning, one of Multi-Color's goals was to consolidate WSMEX's business with that of another Mexican printing label company that Multi-Color wholly owns and controls. There was just one problem with this plan: under WSMEX's bylaws and Mexican law, Multi-Color needed Plaintiff's consent to effectuate its consolidation plan and Plaintiff was not willing to provide such consent.

6.      From September 2019 through September 2020, Multi-Color tried a series of under-handed measures to make Plaintiff "go away" so that it could move forward with its consolidation plan. Multi-Color first tried to dilute Plaintiff's shareholdings in order to take away his veto power under the Bylaws and Mexican law. When that failed, Multi-Color threatened Plaintiff with legal action based on frivolous and unfounded claims. When that failed, Multi-Color revoked Plaintiff's executive powers, removed him from his long-standing role as Chairman of WSMEX's board of directors, blacklisted him from the company that he created, and threatened WSMEX's employees with termination if they communicated with Plaintiff. And when that failed, Multi-Color made a series of misrepresentations designed to trick Plaintiff into selling his shares to Multi-Color at less-than-fair-market value. That tactic also failed.

7.     Because Multi-Color could not convince Plaintiff to give his company away, Multi-Color decided that it would just ***take it from him***. In October 2020, Multi-Color told WSMEX's clients that it had unilaterally decided that, by year-end, WSMEX would cease all business activity and would transfer all of its cash, equipment, intellectual property, trade secrets, and clients over to another Mexican entity that Multi-Color wholly owns and controls. In December 2020, Multi-Color followed through with its threat when it fired WSMEX's employees, boarded up WSMEX's facilities, and sent all of WSMEX's assets to Multi-Color's Mexican wholly owned subsidiary.

8.     Multi-Color's December 2020 measures constitute corporate theft. Multi-Color had no authorization to close WSMEX and loot its assets. Multi-Color never obtained a resolution from WSMEX's board of directors or from its disinterested shareholders (*i.e.*, Plaintiff) approving these measures. And Multi-Color never paid Plaintiff his 40% share of the business. Instead, ***Multi-Color took 100 percent of the value of the business while only owning 60 percent of it***.

9.     This litigation is related to the action styled as *In re Ex Parte Application* of Ricardo Martínez-Porte for an Order to Conduct Discovery for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782, Case No. 1:21-mc-00006, filed with this Court in June 2021 (the "**1782 Action**"). As explained further below, Plaintiff obtained documents in the 1782 Action demonstrating, *inter alia*, that the December 2020 measures were planned, designed, and executed by Multi-Color from its corporate headquarters in this District.

10.     Plaintiff brings claims against Multi-Color under WSMEX's bylaws ("**Bylaws**") and Mexican law to redress harm caused by Plaintiff's unauthorized taking of Plaintiff's 40 percent share in WSMEX. Alternatively, if this Court finds Plaintiff has no remedy at law under the Bylaws or Mexican law, Plaintiff brings equitable claims against Multi-Color for unjust enrichment and conversion under Ohio law.

## PARTIES, JURISDICTION, AND VENUE

11.    Plaintiff Ricardo Martínez-Porte is a Mexican national. Plaintiff owns 40 percent of its shares and controls two of the five seats on WSMEX's board of directors. Plaintiff formerly served as WSMEX's President and Chairman.

12.    Defendant Multi-Color Corporation is a multinational corporation organized under Delaware law with its principal place of business at 4053 Clough Woods Dr., Batavia, Ohio 45103-2587 in this District. Multi-Color owns 60 percent of WSMEX's shares and controls three of the five seats on WSMEX's board of directors.

13.    This Court has subject matter jurisdiction under 28 U.S.C. §1332 because there is complete diversity and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.    This Court has personal jurisdiction over Defendant since Defendant is domiciled, and has committed the acts complained of herein, in this District.

15.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because this is the District in which Defendant is domiciled and a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND

16.    Plaintiff founded WSMEX over 35 years ago in Monterrey, Mexico under the name Impulso y Desarrollo Comercial, S.A. de C.V. The company went through several name changes before adopting the name WSMEX on April 29, 2008. In this Complaint, this company will solely be referred to as WSMEX.

17.    From its founding and until Defendant unlawfully forced its closure in December 2020, WSMEX designed, engineered, and applied labels for consumer products, servicing several

clients across the food, beverage, beauty, automotive, and healthcare industries in North America and elsewhere.

### Plaintiff Grew WSMEX into a Profitable and Successful Business

18.     For approximately the first ten years of its existence, WSMEX was wholly owned, controlled, and run by Plaintiff. During this time, Plaintiff took a modest salary and reinvested all company profits back into the company. WSMEX used these profits, *inter alia*, to hire employees, purchase printing equipment, and better service the demands of its growing list of clients.

19.     In or around 1995, Plaintiff had grown WSMEX to the point that it was big enough to be viewed as an attractive business partner to global companies in the printing label industry, including companies located in the United States, that wanted to outsource their printing operations to Mexico to reduce operational costs and overhead.

20.     The idea of partnering with multinational companies appealed to Plaintiff because having a multinational corporate partner increased WSMEX's profile with potential clients located outside of Mexico, including clients located in the United States.

21.     In 1995, Plaintiff sold 60 percent of WSMEX's shares to Porter Chadburn, a United Kingdom company. Porter Chadburn and Plaintiff entered into a Professional Services Agreement wherein Plaintiff agreed to provide professional services in connection with the administration and operation of WSMEX in exchange for a modest salary (the "**PSA**").

22.     At this time, WSMEX formed a five-member board of directors. The board's seats were divided proportionally between the shareholders. Because Plaintiff owned 40 percent of the shares, he controlled two seats on the five-member board of directors (*i.e.*, 40 percent of the board). And because Plaintiff's corporate partner owned 60 percent of the shares, it controlled three seats on the five-member board of directors (*i.e.*, 60 percent of the board).

23.     Also around 1995, WSMEX created its Bylaws, which provide the rules and norms through which WSMEX is governed. Among other things, the Bylaws include myriad safeguards and protections that ensure that Plaintiff's corporate partner cannot unilaterally make decisions on behalf of WSMEX that materially prejudice Plaintiff. Specifically these safeguards and protections provide that certain orders of business that could prejudice the minority shareholder – *e.g.*, the alteration of WSMEX's business plan – need an affirmative supermajority vote by the board of directors (*i.e.*, four of the five votes) and/or an affirmative supermajority vote by shareholders (*i.e.*, at least 66 percent of WSMEX's shares) in order to pass.

24.     At all times since 1995, the Bylaw clauses that protect Plaintiff's minority interest in WSMEX have remained in place and have never been modified in any manner.

25.     At all times since 1995, Plaintiff has owned 40 percent of WSMEX's shares and controlled two of WSMEX's board seats, thus ensuring that the orders of business in the Bylaws that required a supermajority vote could not take place without his authorization.

26.     The identity of Plaintiff's corporate partner changed several times. Porter Chadburn was replaced by Lord Label (a United States company) in 1995. Lord Label was replaced by Mail Well (a United States company) in 2000. Mail Well was replaced by Ren-Mark (a United States company) in 2003. Ren-Mark was replaced by WS Packaging Group ("**WSPG**") (a United States company) in 2008. And WSPG was replaced by Multi-Color in 2019 (as detailed in the sub-section immediately below). Since 1995, WSMEX has been majority-owned by a United States company.

27.     Every corporate partner from 1995 until 2020 consented to the terms of the PSA. During this period, and as part of the professional services he provided under the PSA, Plaintiff oversaw and managed WSMEX's day-to-day activities and ensured WSMEX fulfilled its client obligations. Also in this period, Plaintiff's corporate partners marketed WSMEX to potential

clients located in the United States and managed WSMEX's relations with existing clients. At the conclusion of each calendar year, Plaintiff and representatives from his corporate partner met at an annual retreat to discuss all business matters relating to WSMEX.

28.     At all times since 1995, Plaintiff took a dividend from WSMEX only once. Plaintiff invested all other profits into WSMEX to help it grow.

29.     Due to Plaintiff's contributions, WSMEX became very profitable. Financial reports from WSMEX and independent accounting firms detail that WSMEX's earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") steadily increased from 9.1 percent in 2017, to 19.5 percent in 2018, to 25.4 percent in 2019, to 30 percent in 2020. Those reports also detail that WSMEX's net sales almost doubled between 2017 to 2020, from MXN $64.4 million to MXN $119 million.

### Multi-Color Replaces WSPG as Plaintiff's Corporate Partner

30.     On February 6, 2018, a private equity fund based in Beverly Hills, California named Platinum Equity ("**Platinum**") acquired a controlling stake in WSPG.

31.     Platinum, like other private equity funds, is in the business of purchasing companies in various sectors with an eye on making them more lucrative and selling them in the short term at a profit. Unbeknownst to Plaintiff at the time of this acquisition, Platinum also intended to acquire Multi-Color in a separate transaction and then merge Multi-Color with WSPG.

32.     Multi-Color is one of the largest printing label companies in the world, valued well over USD $2 billion with 109 label-producing operations in 26 countries and more than 10,000 employees. Multi-Color is the 100 percent owner of Multi-Color Label Corporation-México, S.A. de C.V., located in Guadalajara, Mexico ("**Multi-Color Mexico**"), one of WSMEX's biggest competitors.

33.     In December 2018, Plaintiff attended WSMEX's annual retreat in Cancun, Mexico. At this retreat, a WSPG representative asked Plaintiff if he was ready to walk away from WSMEX and sell his WSMEX shares to WSPG. Plaintiff was surprised by this query given how successful his partnership had been with WSPG over the past decade. Plaintiff, nevertheless, made clear to the WSPG representative that Plaintiff would only sell his shares in the company at a fair-market price.

34.     The reason for WSPG's query at the 2018 annual retreat became clear when news broke in February 2019 that Platinum intended to acquire Multi-Color and merge it with WSPG, leaving behind one company: Multi-Color. Because Multi-Color owned WSMEX's competitor in Mexico (Multi-Color Mexico), it would have been a conflict of interest for Multi-Color to become WSMEX's majority shareholder.

35.     One way to resolve this conflict would have been for Multi-Color to consolidate the businesses of its Mexican subsidiaries (WSMEX and Multi-Color Mexico) into one business. But WSMEX's Bylaws required an affirmative supermajority vote to disrupt WSMEX's business in this manner. Multi-Color could attain this supermajority by obtaining Plaintiff's consent or, alternatively, by purchasing Plaintiff's shares. On information and belief, this legal barrier is the reason that WSPG asked Plaintiff (during WSMEX's annual retreat in December 2018) if he was willing to sell his shares to his corporate partner.

36.     On March 27, 2019, Plaintiff (through his Mexican counsel) sent a letter to the U.S. law firms who were involved in the contemplated transactions between Multi-Color, WSPG, and Platinum. In that letter, Plaintiff explained that if the contemplated transactions went through, there would be an irreconcilable conflict of interest since Multi-Color would simultaneously be the sole

owner of Multi-Color Mexico and the majority owner of WSMEX. Plaintiff also requested to have a telephonic conference to further discuss this matter. Plaintiff never received any response.

37. In the following months, Plaintiff attempted to convene a board meeting in hopes of discussing this matter with the WSPG representatives who sat on WSMEX's board. But WSPG refused to attend.

38. In July 2019, Multi-Color announced that it had been acquired by Platinum and that Multi-Color had merged with WSPG. Multi-Color also announced that the combined entity would continue under the name "Multi-Color Corporation" and would be headquartered in Batavia, Ohio. WSPG became a business unit of Multi-Color.

39. After the merger, Multi-Color sought to close WSMEX and consolidate WSMEX's business with that of Multi-Color Mexico in order to lower overhead costs and raise profits. Multi-Color understood that, because its intended plan would harm Plaintiff's minority interest, Multi-Color could not execute its plan legally under the Bylaws or Mexican law without formal approval by a supermajority of WSMEX's shares (*i.e.*, 66 percent) and/or a supermajority of WSMEX's board (*i.e.*, four votes).

**Multi-Color Attempts to Dilute Plaintiff's Shareholdings**

40. To obtain the required supermajorities, Multi-Color first tried to dilute Plaintiff's shares in WSMEX. This attempted dilution occurred at a September 2019 WSMEX shareholder meeting called by Multi-Color and attended only by Multi-Color. At the meeting, Multi-Color introduced a resolution that called for WSMEX to assert that Multi-Color had no conflict of interest despite simultaneously being the 60 percent majority shareholder of WSMEX and the 100 percent owner of Multi-Color Mexico. Its rationale was that no conflict existed because Multi-Color had

not yet diverted WSMEX's business or clients to Multi-Color Mexico. Because that resolution only required a simple majority, it passed.

41.     Also at that shareholder meeting, Multi-Color resolved to have WSMEX recognize a "debt" that WSMEX supposedly owed to Multi-Color arising from the purchase of a used piece of printing equipment. Multi-Color further resolved to have WSMEX pay this debt by issuing an additional 104,400 shares of WSMEX to Multi-Color, which would have increased Multi-Color's shareholding in WSMEX from 60 percent to approximately 87 percent. Conversely this transaction would have decreased Plaintiff's shareholding in WSMEX from 40 percent to approximately 13 percent. Because those resolutions only required a simple majority, they passed.

42.     WSMEX, however, never issued the 104,400 shares because the "debt" referenced in the September 2019 resolution never existed. WSMEX had already paid for the equipment in question without loans of any kind from Multi-Color. Thus, Multi-Color's attempted dilution of Plaintiff's shares – and its first attempt at obtaining the required supermajorities – failed.

### Multi-Color Tries to Bully Plaintiff into Selling His Shares

43.     For its second attempt to obtain a supermajority of WSMEX's shares, Multi-Color tried to coerce Plaintiff into selling his shares in WSMEX to Multi-Color at a bargain price. As demonstrated below, Multi-Color tried to achieve this outcome by: (i) removing Plaintiff from his roles at WSMEX; (ii) removing Plaintiff's physical access to the company he created; (iii) taking away Plaintiff's sole source of income; (iv) making frivolous legal demands against Plaintiff; and (v) making a series of misrepresentations to Plaintiff in order to convince him to sell his shares in WSMEX to Multi-Color at pennies on the dollar.

44.     First, Multi-Color undertook to remove Plaintiff from each of his posts at WSMEX. On February 4, 2020, Multi-Color notified Plaintiff in writing that it resolved to fire Plaintiff from his longstanding roles as President and Chairman of WSMEX at a prior shareholder meeting that

he did not attend. Plaintiff, however, remained a Director and continued to control two of the five seats on WSMEX's board of directors.

45.     The February 4, 2020 notice also provided that, at a prior shareholder meeting that Plaintiff did not attend, Multi-Color resolved to "revoke each and every one of the powers granted to [Plaintiff] by [WSPG] prior to September 20, 2019." And this notice stated that, by virtue of the foregoing, Plaintiff is "***formally and legally demanded to immediately refrain from using any power that [WSPG] has granted [Plaintiff] prior to September 20, 2019***" (emphasis in original).

46.     The February 4, 2020 notice did not provide any rationale or basis for Multi-Color's abrupt decisions to: (i) remove Plaintiff from his roles as President and Chairman; or (ii) revoke his powers of attorney as to WSMEX.

47.     At or around this time, Multi-Color caused WSMEX to revoke Plaintiff's access to WSMEX's systems and facilities. Multi-Color also placed armed guards at the door of the facilities to ensure Plaintiff could not enter the premises. And Multi-Color instructed WSMEX's employees – all of whom had been hired by Plaintiff and had become a part of Plaintiff's extended family – that they would be fired if they communicate with Plaintiff.

48.     Multi-Color next tried to make Plaintiff financially desperate. On February 5, 2020, Multi-Color, through a local Cincinnati-based law firm, sent a letter to Plaintiff informing him that Multi-Color caused WSMEX to end payments under the PSA – which consisted of Plaintiff's only source of income – and informing Plaintiff that he "should not expect to receive further payments from" WSMEX moving forward.

49.     The letter also accused Plaintiff of engaging in "illegal conduct" because he drafted a WSMEX check payable to himself for MX$2,051,500 (approximately USD $100,000) and that Multi-Color "demand[ed] immediate repayment of such amount." This legal demand was frivolous

and unfounded. The check in question concerned a loan from WSMEX to Plaintiff that Plaintiff legally attained, that was collateralized by a promissory note that Plaintiff appropriately registered, and that WSPG had previously approved. Notably, the letter failed to provide any stated basis for Multi-Color's belief that the loan was "illegal."

50.     It was also troubling to Plaintiff that Multi-Color believed it was authorized to cause WSMEX to cancel the PSA payments and the loan agreement in unilateral fashion. Multi-Color could not make unilateral business decisions on behalf of WSMEX on the sole basis that it owned 60 percent of its shares. Under the Bylaws and Mexican law, Multi-Color needed to have some form of authorization from WSMEX, such as a shareholder resolution, a board resolution, and/or a power of attorney in order to terminate the PSA or loan agreement on behalf of WSMEX. On information and belief, Multi-Color never obtained any such authorization and the letter did not identify any such authorization with regard to these measures.

51.     Instead, the letter suggested Multi-Color did not need any authorization to execute these measures because Multi-Color believed WSMEX was its "wholly owned subsidiary." The letter even collectively referred to Multi-Color and WSMEX in singular fashion as "the Company" and without any refernce to the documented fact that Plaintiff owned 40 percent of WSMEX. The letter also states that, because Multi-Color believed it completely owned and controlled WSMEX, all "further communication with respect to [Plaintiff's] ownership interest in [WSMEX] should be directed to [Multi-Color's] Chief Executive Officer, Nigel Vincombe" (located in Multi-Color's headquarters in this District). An excerpt of this letter is provided below:



Michael J. Moeddel
D: 513.639.3962
mmoeddel@kmklaw.com

February 5, 2020

Ricardo Martinez Porte
Calle Misión de San Francisco de Asís #27,
Colonia Jardines Coloniales, San Pedro Garza
García, Nuevo León, México, Código Postal
66230

Dear Mr. Porte:

      Our firm serves as U.S. legal counsel to Multi-Color Corporation and its wholly owned subsidiary, WS Packaging Mexico, S.A. de C.V. (collectively, the "Company"). As you are aware, Multi-Color Corporation has merged its operations with WS Packaging under the ownership of Multi-Color Corporation. Please be on notice that Multi-Color Corporation is now responsible for all matters related to its ownership interest in WS Packaging Mexico and any further communications with respect to your ownership interest in the Company should be directed to Multi-Color Corporation's Chief Executive Officer, Nigel Vinecombe. Please contact me to arrange any communications with respect to your interest in the Company.

52.     Multi-Color's assertion that WSMEX was its "wholly owned subsidiary" was false. Plaintiff at all relevant times owned 40 percent share of WSMEX's shares. This fact is supported by a shareholder certificate Plaintiff obtained from the relevant Mexican judicial authorities. To date, Multi-Color has never provided evidence supporting its claim that WSMEX is its "wholly owned subsidiary."

53.     The local law firm's assertion, in the letter, that it was acting as "U.S. legal counsel" to WSMEX was also false. On information and belief, WSMEX never engaged the law firm to act as WSMEX's legal counsel. And, when pressed by Plaintiff on this point, the law firm refused to provide Plaintiff any proof that it had received a power of attorney or some other authorization to act on behalf of WSMEX in this or any other legal matter.

54.     After obtaining receipt of the letter, Plaintiff and his lawyers communicated with Multi-Color by telephone and in writing to correct the myriad falsehoods in the letter and for the good-faith reason of resolving the apparent disputes between Plaintiff and Multi-Color.

55.     In the course of these discussions, the parties discussed the prospect of Multi-Color purchasing Plaintiff's 40 percent share in WSMEX. Though Multi-Color maintained (falsely and without support) that Multi-Color "wholly owned" WSMEX, Multi-Color entertained the idea of paying Plaintiff a sum of money to make him "go away" and to allow Multi-Color to consolidate WSMEX's business with that of Multi-Color Mexico, as Multi-Color had always intended but had not yet done given the supermajority restrictions in the Bylaws.

56.      Ultimately, these negotiations were ineffective because Multi-Color was unwilling to pay Plaintiff a fair market price (or anything approximating a fair market price) for his WSMEX shares. Rather, Multi-Color offered Plaintiff a "take it or leave it" purchase price that was ***less than ten percent*** than what WSMEX's financial statements and third-party valuations have identified as the fair market value of Plaintiff's WSMEX shares at that time.

57.     Multi-Color's basis for this nuisance offer was that WSMEX was about to lose one of its largest customers, Driscoll's, to a competitor because of WSMEX's alleged inability to offer Driscoll's the printing technology it required for its labels moving forward. Multi-Color also stated to Plaintiff that, because of this supposed fact, Multi-Color planned to close WSMEX by the end of 2020 because WSMEX would no longer be profitable without Driscoll's as a client.

58.     During the aforementioned negotiations, Multi-Color never showed documentation or support for its representations that WSMEX was on the cusp of losing Driscoll's as a client. Nor did Multi-Color provide any support for its assertion that WSMEX would no longer be profitable

on a moving forward basis. And as detailed later in this Complaint, Multi-Color failed to produce **any document** in the 1782 Action that in any way supports those contentions.

59.     Apart from being unsupported, Multi-Color's representations concerning Driscoll's were false. Plaintiff, as the "boots on the ground" at WSMEX since its inception, had never heard of any concerns from Driscoll's representatives concerning WSMEX's printing capabilities. Quite to the contrary, WSMEX's longstanding relationship with Driscoll's had grown significantly in previous years without indication from Driscoll's that WSMEX did not have requisite technology to satisfy Driscoll's printing needs.

60.     Further, if Driscoll's required a different printing technology than what WSMEX could offer (as Multi-Color baselessly contended), WSMEX had financial means to develop that technology given that, as of year-end 2020, WSMEX had approximately USD $2.5 million in cash. WSMEX also could have generated more cash by selling or leasing equipment.

61.     Multi-Color's contention that WSMEX would no longer be a profitable company was also false. WSMEX's audited financial statements from 2020 demonstrate that WSMEX had an EBITDA of approximately 30 percent, surpassing its EBITDA from prior years, and had a gross operating income of approximately MXN $38,507,930.86 (USD $1.9 million).

62.     Further, even if Driscoll's would have terminated its commercial relationship with WSMEX (as Multi-Color baselessly contended), WSMEX had other clients and revenue streams that it could have relied upon to keep the business going, including long-time customers like Glade.

63.     In reality, Multi-Color's contentions about Driscoll's and WSMEX were intended to coerce Plaintiff into accepting a buyout for his WSMEX shares at a distressed price. This tactic, however, did not work. In September 2020, Plaintiff communicated to Multi-Color in writing that he refused to sell his shares at pennies on the dollar. Plaintiff also communicated that Multi-Color

could not close WSMEX or liquidate its assets (as Multi-Color had communicated it would do) in unilateral fashion because the "[B]ylaws require a supermajority vote" for those actions.

## Multi-Color Closes WSMEX and Loots Its Assets

64.     After its unsuccessful attempts to obtain the supermajorities needed to shut down WSMEX and consolidate WSMEX's business with Multi-Color Mexico, Multi-Color changed its tack. In or around October 2020, Multi-Color decided to move ahead with its plan on a unilateral basis and without the authority required by the Bylaws.

65.     On October 6, 2020, Multi-Color sent a notice from its Batavia, Ohio headquarters to WSMEX's customers notifying them that Multi-Color had decided to close WSMEX by the end of December 2020. A true and accurate copy of the notice is included below.

66.     This notice confirms that Multi-Color's decision to close WSMEX was not due to WSMEX suddenly becoming less profitable (as Multi-Color had baselessly asserted to Plaintiff in their negotiations). Rather, the stated reason for this closure was for Multi-Color desire "to align [its] manufacturing capacity and capabilities[,]" *i.e.*, consolidate its business operations in Mexico.

67.     The notice also confirms that Multi-Color continued to treat WSMEX as if it were its wholly owned subsidiary, referring to its Nuevo Leon plant as "our . . . plant" and posturing that Multi-Color had the authority to shut down WSMEX in unilateral fashion. Again, this position is false. Plaintiff has at all relevant times held 40 percent of WSMEX's shares and enjoyed various protections under the Bylaws, including the protection that his corporate partner could not shut down WSMEX without Plaintiff's express authorization, which was never given here.

68.     By the end of December 2020, Multi-Color followed through on its threat. Without authorization from a supermajority of WSMEX's shareholders or directors (or any other type of authorization from WSMEX) and solely in its capacity as majority shareholder of WSMEX, Multi-Color:

      a.  Closed WSMEX's facilities;

      b.  Terminated WSMEX's employees;

      c.  Transferred WSMEX's machinery and equipment to Multi-Color Mexico;

      d.  Transferred WSMEX's client accounts to Multi-Color Mexico;

      e.  Transferred WSMEX's intellectual property to Multi-Color Mexico;

      f.  Transferred WSMEX's trade secrets to Multi-Color Mexico; and

      g.  Took possession of the USD $2.5 million in cash belonging to WSMEX.

      h.  Took specific actions to avoid the jurisdiction of the Mexican courts, such as by transferring WSMEX's cash to accounts Multi-Color controls in the United States.

69. As of the date of this Complaint, Multi-Color has not compensated Plaintiff in any way, much less paid him for the fair market value of his 40 percent share of the WSMEX assets that Multi-Color unjustifiably looted entirely for its gain. Put differently, in December 2020, Multi-Color took 100 percent of WSMEX's value despite only owning 60 percent of the company.

## Multi-Color's Actions Were Unauthorized

70. As alleged *supra*, the Bylaws contain several provisions designed to protect and safeguard Plaintiff's minority interest in WSMEX. These protections, *inter alia*, require that orders of business that affect certain matters can only pass with an affirmative vote by a supermajority of the board of directors (*i.e.*, four votes) or an affirmative vote by a supermajority of the shares (*i.e.*, 66 percent of the shares).

71. Because Multi-Color's actions in December 2020 concerned these matters, Multi-Color – which controlled only three votes on WSMEX's board of directors and which owned only 60 percent of WSMEX's shares – had no authority to perform these matters unilaterally on behalf of WSMEX.

72. For its December 2020 measures to have been legal Multi-Color would have needed to: (i) convene a meeting of the board of directors and an extraordinary shareholder meeting; (ii) propose its intended orders of business; and (iii) obtain affirmative supermajority votes in favor of those orders of business. In other words, Multi-Color would have needed Plaintiff to vote in favor of those resolutions, since he controlled two seats on the board of directors and owned 40 percent of WSMEX's shares. But Multi-Color never called a meeting of the board of directors or an extraordinary shareholder meeting. And Plaintiff never authorized Multi-Color's plan. Quite to the contrary, Plaintiff told Multi-Color on numerous occasions that said plan could only occur if Multi-Color paid a fair market price for Plaintiff's shares, which Multi-Color refused to do.

73. The supermajority restrictions in the Bylaws are designed to safeguard Plaintiff's minority interest. Articles Fourteen, Twenty-Three, and Twenty-Six of the Bylaws bestow Plaintiff with the supermajority protections. Under binding Mexican law, these Bylaws must be interpreted in accordance with the principle of good faith and the true intent of the parties, *i.e.*, to protect Plaintiff from business transactions that materially prejudiced or harmed his interests in WSMEX.

74. Article Fourteen of the Bylaws provides:[1]

> **FOURTEENTH**: For the Meetings of the Board of Directors to be valid, a majority of the Directors or their respective Substitutes must always attend, whether the Meeting is held on first or subsequent calls. The Board of Directors shall adopt its resolutions by a majority vote of the Board Members in attendance, ***it being understood that the favorable vote of at least four (4) designated Board Members shall be required to resolve any of the following matters*** (emphasis added):
>
> 1) Approval of the Business Plan and its material amendments.
> 2) Appointment, compensation, and removal of the Chief Executive Officer.
> 3) Resolutions adopted by the shareholders in connection with the financials statements of the Company.
> 4) Resolutions adopted by the shareholders regarding the distribution of dividends.
> 5) Approval, if applicable, of the annual budget.
> 6) Resolutions adopted in connection with the granting of mortgages, pledges, sureties, or any other guarantee charged to the Company, the amount of which exceeds $50,000.00 dollars of the United States of America.
> 7) Resolutions adopted in connection with the sale of assets of the Company, the amount of which exceeds $50,000.00 dollars of the United States of America.
> 8) Resolutions related to the incorporation of corporations, or the acquisition of shares representing the capital stock of other corporations, whose investment exceeds $50,000.00 dollars of the United States of America.
> 9) Resolutions adopted in connection with the performance of any transaction outside the normal course of business, whose investment exceeds $50,000.00 US dollars.
> 10) Resolutions related to the execution of any agreement or contract in which, directly or indirectly, the members of the

---

[1] This is an English-language translation of Article Fourteen of the Spanish-language Bylaws.

> board of directors or shareholders of the Company are parties, the purpose of which is the acquisition or rental of real estate.
> 11) Resolutions relating to the granting of loans to the Company's shareholders, (if the purpose of it is the acquisition or rental of real estate).
> 12) Resolutions relating to the acquisition of any real estate.
> 13) The granting of powers of attorney for acts of ownership outside the normal course of the Company's activities.
> 14) Resolutions relating to the amendment of the corporate bylaws.

75. Multi-Color's unilateral measures taken in December 2020 required an affirmative vote of a supermajority of WSMEX's board of directors because:

a. Closing WSMEX, terminating its employees, and transferring its assets to Multi-Color Mexico were material alterations to WSMEX's business plan, triggering the protection under Article 14(1). Prior to these measures, WSMEX's business plan was to print labels for multinational clients. But as of December 31, 2020, WSMEX had no business activity of any kind, much less employees, printing equipment, or other assets needed to execute the preexisting business plan.

b. Closing WSMEX, terminating its employees, and transferring its assets to Multi-Color Mexico were transactions outside of WSMEX's normal course of business, triggering the protection under Article 14(9). At no other time in its 35-year history had WSMEX ever undertaken such drastic and injurious transactions.

c. Transferring WSMEX's assets to Multi-Color Mexico triggered the protection set forth in Article 14(10) because Multi-Color was on both sides of those transactions. As alleged *supra*, at the time these measures occurred, Multi-Color wholly owned Multi-Color Mexico and owned 60 percent of WSMEX.

d. Transferring all of WSMEX's equipment, intellectual property, trade secrets, and clients to Multi-Color Mexico constituted a sale of assets exceeding USD $50,000, triggering the protection under Article 14(7). According to WSMEX's financial

reports, the value of these assets was several millions of dollars. To the extent that Multi-Color characterized this asset transfer as a "loan" rather than a sale, the loan triggered the protection set forth in Article 14(11).

e. On information and belief, Multi-Color never had a power of attorney to undertake any measure on behalf of WSMEX. To the extent that Multi-Color had a power of attorney to execute its December 2020 measures, such an authorization would have breached Article 14(13) because a supermajority of the board never approved it.

76. Article Twenty-Six of the Bylaws provides that resolutions adopted by shareholders in an "Extraordinary Shareholders' Meeting" require an affirmative vote equal to 66 percent of the shares to pass.

77. Article Twenty-Three of the Bylaws provides that WSMEX shareholders must call an Extraordinary Shareholders' Meeting when considering the following orders of business:

> **TWENTY-THIRD**: Extraordinary Shareholders' Meetings may be held at any time and shall deal with the following matters, or any other matters that are designated by law or by these Bylaws as matters for an Extraordinary Shareholders' Meeting:
>
> 1) Extension of the duration of the Company.
> 2) Early dissolution of the Company.
> 3) Increase or reduction of the minimum fixed capital.
> 4) Change of the purpose of the Company.
> 5) Change of the nationality of the Company.
> 6) Transformation of the Company.
> 7) Merger with another company.
> 8) Issuance of preferred shares.
> 9) Redemption by the Company of its own shares and issuance of shares that do not represent capital stock
> 10) Issuance of bonds.
> 11) Any other amendment to the Company's Bylaws.
> 12) Any other matter for which the law or the Company's Bylaws require a special quorum.

78. Multi-Color's unilateral measures taken in December 2020 required an affirmative vote of a supermajority of WSMEX's shareholders because:

a. Closing WSMEX, firing its employees, and transferring its assets to Multi-Color Mexico was a *de facto* early dissolution of WSMEX, triggering the protection under Article 23(2). On information and belief, since December 2020 WSMEX has remained closed, has conducted no business activities, and has no remaining assets.

b. Closing WSMEX, firing its employees, and transferring its assets to Multi-Color Mexico was a *de facto* change of the business purpose of WSMEX, triggering the protection under Article 23(4). Prior to these measures, WSMEX's purpose was to print labels for multinational clients. That purpose materially changed after Multi-Color stripped WSMEX of everything it needed to continue its business of printing labels.

c. To the extent that Multi-Color never sold nor loaned WSMEX's assets to Multi-Color Mexico, but rather just transferred them without consideration of any kind, such actions amount to a *de facto* merger of WSMEX and Multi-Color Mexico that triggered the protection set forth in Article 23(7).

79. The Bylaws also incorporate Mexico's General Corporations Law (*Ley General de Sociedades Mercantiles*) ("**GCL**") by reference. The GCL regulates the rights and obligations of shareholders and directors and, together with the Bylaws, sets the procedures that shareholders and directors must take in order to execute decisions on behalf of the company.

80. Articles 156 and 196 of the GCL provide that directors or shareholders may not act or deliberate on behalf of a company when they have a conflict of interest.[2]

> **Article 156**. Any Director who has an interest in any transaction that is opposed to that of the corporation, shall disclose this to the other Directors and shall abstain from any deliberation and resolution. The

---

[2] This is an English-language translation of Articles 156 and 196 of the Spanish-language GCL.

Director who contravenes this provision shall be liable for the damages caused to the corporation.

**Article 196**. Any shareholder who in a specific transaction has, on his own account or on behalf of others, an interest contrary to that of the corporation, shall abstain from any deliberation related to such transaction. The shareholder who contravenes this provision shall be liable for damages, when without his vote the majority necessary for the validity of the determination would not have been achieved.

81.     Multi-Color violated Articles 156 and 196 of the GCL when it closed WSMEX and transferred all of WSMEX's assets to Multi-Color Mexico, which Multi-Color wholly owns and controls. As alleged *supra*, Multi-Color admitted in its September 2019 resolution (that attempted to dilute Plaintiff's shares) that a conflict of interest would arise under Mexican law if Multi-Color were to "divert business [or] clients" from WSMEX to another entity that it owns or controls. That is precisely what Multi-Color did when it transferred WSMEX's equipment, intellectual property, trade secrets, and clients to Multi-Color Mexico in December 2020.

## The 1782 Action

82.     On June 2, 2021, Plaintiff commenced the 1782 Action to obtain discovery located in this District that would aid: (i) a labor proceeding he filed against WSMEX in Mexico in 2020 to recover past-due payments under the PSA; and (ii) a contemplated criminal case against Multi-Color Mexico arising from its unauthorized possession and use of WSMEX's assets.

83.     In July 2021, this Court granted Plaintiff's application in its entirety and authorized Plaintiff to serve a document subpoena on Multi-Color to obtain documents located in this District that bear on the subject matter related to those proceedings.

84.     Plaintiff subsequently served Multi-Color with a document subpoena requesting, among other things, documents and information related to the circumstances behind the December

2020 measures. In response to the subpoena, Multi-Color produced 26 documents and sent Plaintiff a written account as to what transpired in December 2020.

85. Multi-Color's document production in the 1782 Action confirmed that:

    a. Multi-Color planned, directed, and executed *each* of the December 2020 measures from its headquarters in this District.

    b. Multi-Color conducted the December 2020 measures without authorization of any kind from WSMEX, *e.g.* without resolutions from WSMEX's board of directors or shareholders.

    c. Notwithstanding its assertions to Plaintiff and others throughout 2020 that WSMEX was Multi-Color's "wholly owned subsidiary," Multi-Color at all relevant times knew that Plaintiff owned 40 percent of WSMEX's shares. This admission is in a presentation that Multi-Color's executives (each located in this District) created in January 2020 and maintained through 2021 to track the evolution of Multi-Color's plan to consolidate its Mexican business operations.

    d. In or around September 2020, Multi-Color convinced WSMEX's client, Driscoll's, to cancel its contract with WSMEX and enter into a separate contract with Multi-Color Mexico. Notably, Multi-Color did not produce any document demonstrating that Driscoll's had any concerns whatsoever about WSMEX's ability to service its printing label needs. Multi-Color's contention, alleged *supra*, that WSMEX could not service Driscoll's needs is further belied by the fact that Multi-Color transferred WSMEX's printing equipment to Multi-Color Mexico to service Driscoll's orders.

    e. Multi-Color's low-ball buyout offer to Plaintiff in 2020 was not based on any fair market valuation of Plaintiff's shares. And Multi-Color's internal documents show

that Multi-Color believed that the value of Plaintiff's shares was much higher than what Multi-Color offered Plaintiff in 2020 during their buyout negotiations.

f. After WSMEX closed, Multi-Color transferred approximately USD $2.5 million in cash from WSMEX's bank accounts in Mexico to bank accounts in Ohio that Multi-Color controls. Multi-Color's internal documents demonstrate that this transaction was done "to avoid having [WSMEX's] funds in Mexican court jurisdiction" where Plaintiff could access them through a judicial proceeding.

g. Multi-Color commenced a criminal proceeding in Mexico against Plaintiff as part of its strategy to disincentivize him from seeking his fair share of the business that Multi-Color converted in December 2020. As of the date of the Complaint, Plaintiff has not received any notice that he is the subject of a Mexican criminal investigation and this fact demonstrates the frivolous nature of Multi-Color's criminal complaint.

86.     In September 2022, the parties participated in a one-day, confidential mediation in an attempt to achieve a global resolution of all disputes between the parties. That mediation was unsuccessful.

## COUNT I
## BREACH OF THE BYLAWS

87.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

88.     Under Mexican law, Plaintiff can seek damages directly against Multi-Color under the Bylaws if Multi-Color's breach of the same harmed Plaintiff.

89.     At all relevant times, Plaintiff owned 40 percent of WSMEX's shares.

90.     At all relevant times, Multi-Color owned 60 percent of WSMEX's shares.

91.     Articles Fourteen, Twenty-Three, and Twenty-Six of the Bylaws protect Plaintiff's minority interest in WSMEX by, *inter alia*, requiring that certain orders of business be put to a

vote of the board of directors or shareholders and ensuring that such orders of business will only pass if a supermajority of either the board of directors or shareholders vote in favor of those orders of business.

92.     At all relevant times, the protections set forth in Articles Fourteen, Twenty-Three, and Twenty-Six of the Bylaws were fully binding on WSMEX's shareholders and directors.

93.     Closing WSMEX, firing WSMEX's employees, and transferring WSMEX's assets were orders of business that required an affirmative supermajority vote of the board of directors under Article Fourteen of the Bylaws.

94.     Closing WSMEX, firing WSMEX's employees, and transferring WSMEX's assets were orders of business that required an affirmative supermajority vote of the shareholders under Articles Twenty-Three and Twenty-Six of the Bylaws.

95.     Multi-Color closed WSMEX, fired its employees, and transferred its assets without calling a board of directors meeting or obtaining the required supermajority vote from said board.

96.     Multi-Color closed WSMEX, fired its employees, and transferred its assets without calling an extraordinary shareholder meeting or obtaining the required supermajority vote from said shareholders.

97.     Multi-Color closed WSMEX, fired its employees, and transferred its assets without any authorization of any kind from WSMEX.

98.     Before Multi-Color's measures in December 2020, Plaintiff's 40 percent share of WSMEX's assets had considerable value.

99.     Multi-Color's measures in December 2020 deprived Plaintiff of all or substantially all of the value of his WSMEX shares.

## COUNT II
## BREACH OF THE GCL

100.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

101.    Under Mexican law, Plaintiff can seek damages directly against Multi-Color under the GCL if Multi-Color's breach of the GCL harmed Plaintiff.

102.    At all relevant times, Plaintiff owned 40 percent of WSMEX's shares.

103.    At all relevant times, Multi-Color owned 60 percent of WSMEX's shares.

104.    At all relevant times, Multi-Color controlled three seats on the board of directors of WSMEX.

105.    Articles 156 of the GCL prevents a director from conducting business on behalf of a company if the director has a conflict of interest with respect to that order of business.

106.    Article 196 of the GCL prevents a shareholder from conducting business on behalf of a company if the director has a conflict of interest with respect to that order of business.

107.    Multi-Color had a conflict of interest when it decided to close WSMEX and transfer its assets to Multi-Color Mexico, which Multi-Color wholly owns and controls.

108.    Before Multi-Color's measures on December 2020, Plaintiff's 40 percent share of WSMEX had considerable value.

109.    Multi-Color's measures in December 2020 deprived Plaintiff of all or substantially all of the value of his WSMEX shares.

## COUNT III
## UNJUST ENRICHMENT

110.    Should this Court find that Plaintiff has no remedy against Multi-Color under the Bylaws or GCL, Plaintiff brings a cause of action for Unjust Enrichment pursuant to this Court's equitable powers.

111.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

112.    Plaintiff founded WSMEX over 35 years ago.

113.    For nearly three decades, in his capacity as President of WSMEX, Plaintiff was the "boots on the ground" who oversaw the day-to-day activities of WSMEX.

114.    For nearly three decades, Plaintiff served as Chairman and Director of WSMEX and, in those capacities, managed WSMEX's affairs.

115.    Except for one occasion, Plaintiff never took dividends from his shares in WSMEX. Instead, Plaintiff reinvested WSMEX's profits back into the company to help it grow.

116.    Because of Plaintiff's contributions, WSMEX became very profitable, achieving an EBITDA of 9.1 percent in 2017, 19.5 percent in 2018, 25.4 percent in 2019, and 30 percent in 2020.

117.    Multi-Color knew Plaintiff owned 40 percent of WSMEX's shares.

118.    Multi-Color knew that the value of Plaintiff's shares originated from the assets held by WSMEX, including its cash, equipment, intellectual property, trade secrets, and client accounts.

119.    In December 2020, Multi-Color unilaterally transferred WSMEX's assets to Multi-Color without any authorization from WSMEX and in contravention of the Bylaws.

120.    Prior to December 2020, Plaintiff's shares in WSMEX had significant value.

121.    Multi-Color's unauthorized measures in December 2020 deprived Plaintiff of all or substantially all of the value of his shares in WSMEX.

122.    As a result of its unauthorized actions in December 2020, Multi-Color was unjustly enriched with the value that Plaintiff lost with respect to his shares in WSMEX.

123.    Multi-Color has not paid Plaintiff for his corresponding share of WSMEX's assets, which Multi-Color wholly took for its own gain in December 2020.

## COUNT IV
## CONVERSION

124.    Should this Court find that Plaintiff has no remedy against Multi-Color under the Bylaws or GCL, Plaintiff brings a cause of action for Conversion pursuant to this Court's equitable powers.

125.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

126.    At all relevant times, Plaintiff owned 40 percent of WSMEX's shares.

127.    Multi-Color knew that the value of Plaintiff's shares originated from the assets held by WSMEX, including its cash, equipment, intellectual property, trade secrets, and client accounts.

128.    Prior to December 2020, Plaintiff's shares in WSMEX had significant value.

129.    Multi-Color took the value of Plaintiff's shares in or around December 2020 when it transferred WSMEX's assets to a company Multi-Color wholly owns and controls.

130.    This taking was wrongful because neither WSMEX nor Plaintiff authorized it.

131.    Multi-Color has not paid Plaintiff for his corresponding share of WSMEX's assets, which Multi-Color wholly took for its own gain in December 2020.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of the Plaintiff granting the following relief:

A.    A monetary award to Plaintiff for ***not less than USD $15 million*** to be determined at trial;

B.    An award to Plaintiff of pre-judgment and post-judgment interest;

C.    An award to Plaintiff for his costs of suit, expenses, and reasonable attorneys' fees, as permitted by law; and

D.    Such other, further, and different relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by

jury for all issues so triable.

Dated: December 27, 2022

OF COUNSEL:
Marco Molina (*pro hac vice* forthcoming)
BAKER & HOSTETLER LLP
600 Anton Boulevard
Suite 900
Costa Mesa, CA 92626

BAKER & HOSTETLER LLP

 s/Carrie Dettmer Slye

Carrie Dettmer Slye (0079382)
Trial Attorney
312 Walnut Street
Suite 3200
Cincinnati, OH 45202-4074
Telephone: 513.929.3400
cdettmerslye@bakerlaw.com

*Attorneys for Ricardo Martínez-Porte*